AO 106 (Rev. 04/10)  Application for a Search Warrant

**FILED**
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

DEC 0 7 2015

MATTHEW J. DYKMAN
CLERK

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
9600 Central Avenue SW Trailer #153, Albuquerque, NM )
87121 )

Case No. 15mr810

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment C

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 841(a)(1); 846 and Title 18 1957 | Possession with Intent to Distribute; Conspiracy and engaging in monetary transactions involving property derived from specified unlawful activity |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Julie Olmsted, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/7/15

*Judge's signature*

City and state:  Albuquerque, NM

United States Magistrate Judge Steven C. Yarbrough
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Julie A. Olmsted, being duly sworn, depose and state as follows:

### INTRODUCTION

1.      I am a Special Agent of the Drug Enforcement Administration (DEA), United States

Department of Justice.  I have been a Special Agent since January 2012 and I am currently

assigned to the Albuquerque District Office.  My experience as a Special Agent includes, but is

not limited to, conducting surveillance, interviewing witnesses, debriefing defendants, writing

affidavits for and executing search warrants, and working with undercover agents and

informants.  I have received training in and have experience in the investigation of violations of

the federal drug and money laundering laws, including the offenses listed below.  I have

participated in the investigation of numerous drug trafficking conspiracies, including several

Title III investigations.  As a result, I am, and agents assisting in this investigation, are familiar

with matters including, but not limited to, the means and methods used by persons and drug

trafficking organizations ("DTOs") to purchase, transport, store, and distribute drugs and to hide

profits generated from those transactions.  I also have experience in analyzing and interpreting

drug codes and cryptic dialogue used by drug traffickers.  I am aware that DTOs are concerned

about the efforts law enforcement make to disrupt and dismantle their activities.

2.      I am an investigator assigned to the investigation of a Drug Trafficking Organization

("DTO") that operates in and around Albuquerque, New Mexico.  The investigation of the DTO

focused on individuals that acquired, stored, prepared, packaged, and sold methamphetamine and

heroin in Albuquerque, New Mexico.

3.      I make this affidavit based upon my own personal knowledge, which is substantially

derived from my participation in the investigation, as well as that of fellow agents and officers

1

who have participated in the investigation. In addition, I have developed information I believe to be reliable from additional sources including:

      a.   Information provided by Task Force Officers ("TFO") and Special Agents ("SA") of the DEA, Senior Financial Investigators and other law enforcement officials ("agents"), including oral and written reports that I have received directly or indirectly from said investigators;

      b.   Results of physical surveillance conducted by agents during the investigation;

      c.   Information provided by reliable Source of Information ("SOI");

      d.   Information provided by undercover agents;

      e.   A review of telephone toll records and subscriber information;

      f.   Information derived from consensually recorded conversations;

      g.   Information derived from lawfully intercepted telephone conversations;

      h.   A review of driver's license and automobile registration records; and

      i.   Records from the National Crime Information Center ("NCIC").

4.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search certain premises. This affidavit is intended to show only that there is sufficient probable cause for the requested search warrant located at 9600 Central Avenue SW Trailer #153, Albuquerque, NM 87121 ("RIVAS' HOUSE") and does not set forth all of my knowledge about this matter. Additionally, agents expect that RIVAS' HOUSE has been used and continues to be used by Gloria Rivas and Ruby Rivas ("SUBJECTS").

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

5.    I believe there is probable cause that the SUBJECTS have committed, are committing,

2

and will continue to commit offenses involving violations of, *inter alia*:

    a.  21 U.S.C. § 841 – Possession with intent to distribute and distribution of a controlled substance, namely methamphetamine and heroin;

    b.  21 U.S.C. § 843(b) – Use of a communication facility to further the commission of a felony controlled substance offense;

    c.  21 U.S.C. § 846 – Conspiracy to possess with intent to distribute and to distribute controlled substances;

    d.  21 U.S.C. §§ 952(a), 960(a), 963 – Conspiracy to import and importation of controlled substances;

    e.  18 U.S.C § 1957 – engaging in monetary transactions involving property derived from specified unlawful activity, and;

    f.  18 U.S.C. § 2 – Aiding and abetting.

## EVIDENCE SOUGHT DURING SEARCH

6.    Based on my training, experience and participation in this and in similar investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses. Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property. This evidence which is discussed in detail in the following paragraphs, including paraphernalia for weighing, packaging and distributing drugs, other contraband, records, documents, and evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds. All such records as described in the paragraphs below can also be produced and/or stored on computers

and other computer-related digital media such as a computer hard drive, external hard drives, thumb drives, secure digital cards and other types of flash memory cards, compact disks and floppy disks, personal digital assistants (PDAs), BlackBerry devices, iPhones, iPods, iPads, digital cameras and cellular telephones.

7.     Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

8.     Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution.  The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances.  Drug dealers commonly store these items on their person, in their residences, in their businesses, in the residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

9.     Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses.  Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators.  These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including

4

precursors, customer lists and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

10.     Drug traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, and passports and visas and their contents.  These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars.  Many of these items are accessible via the internet and can be downloaded and saved on the computer or other media.

11.     Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses.  These off-site storage facilities are often commercial storage lockers and rooms.  These locations are often used to store or hide drugs, contraband, money and other valuables.  Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities.  Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes.  This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

12.     Other evidence of transportation, ordering, possession and sale of drugs can include the following:  telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings

5

books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

13. Drug traffickers usually sell their product for cash. Because large quantities of drugs can sell for thousands of dollars even at the wholesale level, dealers typically may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles and other valuables.

14. Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs. To accomplish these goals, drug traffickers utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

15. Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check

and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and cars.

16.     Drug traffickers typically use telephones, pagers, two-way radio systems, fax machines, other communication systems, many of which can be accessed and controlled by computers or otherwise be communicated with by computers, counter-surveillance devices such as police radio scanners, and related devices in their drug trafficking activities. These items are stored by drug dealers on their person or in their businesses, residences or cars, or the residences of friends or relatives.

17.     Information stored in electronic form on all of the above devices can provide evidence of drug trafficking and the identity of associates. For example, numbers stored in the telephones (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates. Pagers, cellular telephones and other communication devices can contain similar information. Also, logs from fax machines can be evidence of messages sent and received, and the corresponding telephone numbers of possible associates and co-conspirators.

18.     Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs.  They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives.  Digital still and video cameras are becoming commonplace and may be used to record digital photographs or videos.  Scanners may be utilized to convert older format photographs to digital format, and magnetic video can be transferred to digital format. All can be stored in computer hard drives and related digital media.

19.     Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits.  They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

20.     I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

21.     Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences.  This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital pagers (and their contents) cellular/mobile telephones (and their contents), and counter-surveillance devices.

8

22.     Many of the records described above, to include paper records scanned into digital format, also can exist in electronic form on computers.  Further, data that is processed by a computer may be written to the computer hard drive or other storage media even if the user does not intentionally save the information.  For example, a computer operating system may save temporary copies of files as backup copies or such files may remain on the hard drive or other media until overwritten by new data.

23.     Electronic information can remain on computer storage media, such as hard drives, for an indefinite period of time.  I am aware that even when a computer user attempts to delete records from computer storage media, the records may still exist and be recovered through computer forensic techniques.

24.     Based on information provided to me by other DEA Special Agents and computer forensic specialists, I know that computer users sometimes encrypt files, and that such users may keep the encryption passwords or encryption keys separately written in their residences or in a separate computer file, which may be maintained on other portable media as described above.

25.     Based upon my knowledge, training and experience, and consultation with other Special Agents and computer specialists, I know that in order to completely and accurately retrieve data maintained on computers and digital media by numerous software programs, to insure accuracy and completeness of such data, and to prevent the loss of the data from accidental or programmed destruction, it is often necessary that some of the computer equipment, peripherals, related instructions in the form of manuals and notes, as well as the software utilized to operate such a computer be seized and subsequently processed by a qualified computer specialist in a laboratory setting.  This is true because of the following:

    a.  Computer storage devices as described above can store the equivalent of

9

thousands of pages of information. Additionally, a user may try to conceal criminal evidence by storing it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of a crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

   b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data.

   c. Data search protocols are scientific procedures designed to protect the integrity of the evidence and recover even "hidden," erased, compressed, password-protected or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (either from external sources or from a destructive code embedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

26. Because of the potential volume of the data at issue and the technical requirements set forth above, it is usually necessary for the above-referenced computer equipment, digital media and software and its related instructions to be seized and subsequently processed by qualified computer specialists in a laboratory setting.

27. Based upon my knowledge, training and experience and the experience of other law enforcement personnel, I know the searches and seizures of evidence from computers taken from the subject premises commonly require agents to seize most or all magnetic storage devices as well as the central processing units (CPUs). It is important that the analyst be able to properly

re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any application software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation. Without these items, it may be difficult to recreate the computer environment in which the seized data was created. This is important both for thorough analysis and for establishing the ultimate integrity of the seized data.

28.     Based upon my training and experience, as well as the training and experience of other law enforcement personnel and computer specialists, I believe that it is likely that contemporaneous analysis of hard drives, diskettes, CD-ROMS and other computer data storage media will be impractical and extremely time consuming. For that reason, it will be necessary to remove these items so as to facilitate an off-site analysis to locate evidence authorized to be seized by this search warrant. Thus, I request authorization to seize such items for off-site analysis to locate evidence authorized to be seized by the search warrant.

29.     Often, telephone answering machines are used to take messages. Computers may also be utilized as answering machines. The incoming messages can provide evidence of drug trafficking and the identity of associates while the outgoing messages can provide evidence of who controls the telephone line.

30.     Documents showing who owns, occupies or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized. Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns,

keys, deeds and mortgage receipts. These documents may also be produced on computers,

downloaded from online accounts or scanned into digital format and stored on computers and

related digital media.

31.     A list of items agents seek authority to seize is in Attachment B.

## BACKGROUND OF INVESTIGATION

32.     This investigation began in May 2014, when DEA agents received information from a

Source of Information ("SOI") that Guillermo Rivas-Recendiz, also known as "Junior"

("Junior") was a methamphetamine distributor operating in Chihuahua, Mexico and distributing

methamphetamine into New Mexico and throughout the United States. Through the use of this

SOI, agents were able to introduce via cell phone, an undercover ("UC") agent to Junior, who is

believed to reside in Mexico. In June 2014, at the direction of Junior, the UC met with Luis

Zamora ("Zamora") and purchased approximately 752.8 grams of methamphetamine in

exchange for a down payment of $2,000 while in Albuquerque, New Mexico. At Junior's

direction, future payments by the UC were made to a Wells Fargo Bank account, Junior's sister -

Graciela "Gloria" Rivas ("Gloria"), Hugo Viramontes, and Junior's niece Ruby Rivas ("Ruby")

for the remaining amount owed for the 752.8 grams of methamphetamine. These payments are

described in further detail below. Agents attempted to deposit payment for previously obtained

methamphetamine into a Western Union account. Western Union required specific biographical

information from the UC in order to deposit the money. The UC could not provide biographical

information due to the UC being in an undetected role and not wanting to reveal the UC's true

identity. Therefore, agents could not deposit the money using Western Union. Instead Junior

introduced the UC to Gloria to make the future payments. In August 2014, Junior introduced

Esther Ordonez ("Esther"), who resides at 2620 Katrina Drive SW, Albuquerque, New Mexico

("ORDONEZ' HOUSE"), to the UC in order for the UC to obtain future methamphetamine in Albuquerque. During the investigation into Esther, agents discovered Esther was also distributing heroin and utilizing a different SOS for her heroin supply instead of Junior.

33.    In October 2014, the UC and Junior negotiated the purchase of approximately one pound of methamphetamine with payment to be made at a later date. Junior explained to the UC that the methamphetamine would be packaged into three packages, one of which would be high quality methamphetamine and the other two of which would contain red methamphetamine of a lesser quality. Junior informed the UC that the UC would meet with Esther in order to obtain the methamphetamine. On October 10, 2014, the UC met with Esther who provided approximately 553 grams of methamphetamine to the UC. The description of the methamphetamine provided by Esther matched the methamphetamine described by Junior. From October 18, 2014, to November 24, 2014, payment was made for the methamphetamine through Esther's Bank of America account, to Gloria, and to Ruby, as described below.

34.    Between December, 2014, and January, 2015, the UC maintained communication with Junior in reference to the pound of methamphetamine that Junior gave to the UC. On January 7, 2015, the UC met with Esther who provided approximately 279.2 grams of methamphetamine to the UC, on behalf of Junior, for $3,500. In January 2015, the UC provided $1,500 to Gloria and $2,000 to Ruby for the methamphetamine.

35.    Also in January of 2015, the UC maintained communications with Junior to arrange the delivery of one kilogram of methamphetamine, for $13,500, from Mexico to Albuquerque, New Mexico. On January 23, 2015, two UC s met with Lourdes Liliana Romero-Castanon ("Romero") and Jassiel Castanon-Perez ("Castanon") at a storage unit facility in Albuquerque, New Mexico. During the meeting, the two UC's removed approximately 1351.2 grams of

methamphetamine from the oil pan of the 2006 gold Dodge Stratus that Romero and Castanon drove to Albuquerque, New Mexico that day. The UCs provided $1,500 to Romero once the methamphetamine had been removed and the oil pan had been reassembled. Future payments for the methamphetamine were made to Ruby totaling $3,500, as described below. The UC and Junior remained in contact via cellular telephone until March 2015. A payment to Ruby was to be made by the UC, however, agents decided not to pay Ruby.

36.     On June 10, 2015, the UC met with Esther in order to discuss purchasing approximately one kilogram of 'uncut' heroin. During this meeting, and described below, Esther asked the UC if he had spoken to "Memo." Agents know "Memo" to be another name for Junior. The UC advised he had not and added that he did not like working with Memo. Esther stated that Memo had asked her if she had spoken with the UC and stated she told Memo she had not heard from the UC for quite some time. The UC asked Esther if she was still dealing with methamphetamine and asked if she had a supplier besides Memo. Esther stated that Memo was sending a load of methamphetamine to Albuquerque, New Mexico by Wednesday, but she had not received any updates. Esther stated that Junior was going to send her approximately two pounds of methamphetamine and that the heavy set girl, who agents believe to be Castanon, would be transporting it. Esther stated that Ruby was more involved with Junior's drug trafficking activities in Albuquerque, New Mexico, and that she is now driving a $18,000 Dodge Nitro. Esther then offered to sell the UC ounces of methamphetamine for $650.

### 2014

37.     On June 18, 2014, the UC and Gloria arranged to meet in order for the UC to make a payment towards previously obtained methamphetamine to Gloria. Agents observed Gloria depart from RIVAS' HOUSE in a silver Chevrolet Aveo and travel directly to meet with the UC.

14

During this meeting, the UC provided $1,000 to Gloria for the methamphetamine previously provided to the UC on June 4, 2014. The UC told Gloria that the UC was not certain who he would be contacting for future payments to Junior. Gloria advised the UC that she would call her "brother," meaning Junior, in order to find out the details. After the UC meeting, agents maintained continuous surveillance on Gloria as she traveled directly to RIVAS' HOUSE with the illegal drug proceeds. I believe Gloria traveled directly to RIVAS' HOUSE in order to safely store the illegal drugs proceeds there.

38.     On June 26, 2014, the UC and Gloria arranged to meet in order for the UC to provide payment for illegal drugs to Gloria. Agents observed Gloria in a blue Pontiac Grand Am depart from RIVAS' HOUSE and travel directly to meet with the UC. During the meeting, the UC provided $2,000 to Gloria for the methamphetamine previously provided to the UC on June 4, 2014. Agents observed the blue Grand Am travel directly to RIVAS' HOUSE after the UC meeting. I believe that on this occasion, like above, Gloria traveled directly to RIVAS' HOUSE in order to safely store the illegal drugs proceeds.

39.     On July 23, 2014, the UC and Gloria arranged to meet in order for the UC to provide payment for illegal drugs to Gloria. Agents observed Gloria in the Pontiac Grand Am depart RIVAS' HOUSE and meet with the UC. During the meeting, the UC provided Gloria with $1,000 for the methamphetamine previously provided on June 4, 2014. After this meeting, agents observed Gloria travel to a residence unrelated to this investigation and surveillance was terminated.

40.     On July 31, 2014, the UC and Gloria arranged to meet in order for the UC to provide payment for illegal drugs to Gloria. Agents observed Gloria depart from RIVAS' HOUSE in the blue Pontiac Grand Am and travel directly to meet with the UC. During this meeting, the UC

provided $1,300 to Gloria for the methamphetamine provided on June 4, 2014. After the meeting, agents observed Gloria travel to 9808 Camino San Martin SW, Albuquerque, New Mexico. Based on a law enforcement computer indices check on Guillermo Rivas-Recendiz, agents believe the address on Camino San Martin NW is related to Junior.

41.     From August 7, 2014, to August 18, 2014, the UC and Junior negotiated for Junior to provide methamphetamine to the UC, and for the UC to pay the remaining balance owed for the methamphetamine provided on June 4, 2014, to Junior's niece, Ruby. On August 18, 2014, the UC received a phone call from Ruby. During the phone call, the UC and Ruby arranged to meet in order for the UC to provide payment for illegal drugs to Ruby. Agents observed Ruby depart RIVAS' HOUSE in the silver Chevrolet Aveo and travel directly to meet with the UC. During this meeting, the UC provided Ruby $1,000 for the remaining balance owed to Junior for methamphetamine provided on June 4, 2014. Agents observed Ruby depart the parking lot and proceed to the Carniceria La Especial located at 633 Old Coors Dr. SW, Albuquerque, New Mexico and a short time later exit from the Carniceria La Especial. Agents were able to determine that at this location, individuals are able to transfer money. Agents observed Ruby return to RIVAS' HOUSE. I believe after the UC provided Ruby with $1,000, Ruby traveled to the Carniceria La Especial and transferred an unknown amount of illegal drug proceeds.

42.     On October 10, 2014, under the direction of Junior, Esther provided approximately 551 grams of methamphetamine to the UC. This methamphetamine was 'fronted' to the UC and future payments were to be made at the direction of Junior.

43.     On October 28, 2014, the UC and Gloria arranged to meet in order for the UC to provide illegal drug proceeds to Gloria. Agents observed Gloria depart from the trailer complex in a gold Honda Accord, where RIVAS' HOUSE is located and meet with the UC. During this meeting,

16

the UC provided $1,000 to Gloria for the methamphetamine provided on October 10, 2014.

Agents maintained surveillance on Gloria as she traveled to the Carniceria La Especial,

mentioned earlier in this affidavit, and entered into the store.  Shortly after, Gloria exited the

store and entered into the gold Honda Accord.  Agents followed the gold Honda Accord until

Gloria conducted a U-turn in the area of Yucca Drive NW and Central Avenue NW.  At this

time, I believed Gloria conducted a possible 'heat run' in order to locate law enforcement

following her. Agents terminated surveillance at this time due law enforcement possibly being

discovered.

44.      On November 24, 2014, the UC and Ruby arranged to meet at the El Mesquite Market in

order for the UC to provide illegal drug proceeds to Ruby.  Agents observed Ruby depart

RIVAS' HOUSE in the silver Chevrolet Aveo and meet with the UC.  During the meeting, the

UC provided the $1,000 to Ruby for the methamphetamine provided on October 10, 2014.

Agents observed Ruby enter into the El Mesquite Market and shortly after exit and depart the

parking lot and proceed to the Carniceria La Especial and enter into the store.  Surveillance was

terminated at this time, as agents believe Ruby was depositing an unknown amount of illegal

drug proceeds into a bank account.  Even though  agents did not follow Ruby to RIVAS'

HOUSE on this occasion, I believe documentation of this transaction would have been stored at

RIVAS' HOUSE.  Even though  agents did not follow Ruby to RIVAS' HOUSE on this

occasion, I believe documentation of this transaction would have been stored at RIVAS'

HOUSE.

### JANUARY 2015

45.      On January 8, 2015, the UC and Gloria arranged to meet in order for the UC to provide

payment towards methamphetamine to Gloria. Agents observed Gloria in a gold Honda Accord

depart from RIVAS' HOUSE and meet with the UC. During this meeting, the UC provided $1,500 for the methamphetamine obtained on January 7, 2015 from Esther. After the meeting, agents observed Gloria travel to the Carneceria La Especial, shortly after exit from the store and enter back into the Honda Accord and proceed to Inter Cambio Mexicana located down the road from the Carnceria La Especial. Surveillance was terminated based on agents' belief that Gloria was transferring the illegal drug proceeds provided from the UC. Even though, agents did not follow Gloria to RIVAS' HOUSE on this occasion, I believe documentation of this transaction would have been stored at RIVAS' HOUSE.

46.	On January 16, 2015, the UC and Ruby arranged to meet at the El Mesquite Market in order for the UC to provide illegal drugs proceeds to Ruby. Agents observed Ruby depart from RIVAS' HOUSE and meet with the UC at the El Mesquite Market. During the meeting, the UC provided $2,000 for the methamphetamine provided in January 7, 2015. Agents observed Ruby enter into the El Mesquite Market and deposit approximately $300 into an unknown bank account. Agents then observed Ruby exit the Market, enter back into her vehicle and proceed to RIVAS' HOUSE. I believe after the meeting, Ruby transferred $300 into a bank account and stored the remaining $1,700 of illegal drug proceeds at RIVAS' HOUSE.

### FEBRUARY 13, 2015

47.	On February 13, 2015, the UC and Ruby arranged to meet at the Vista Trailer Complex located at 9600 Central Ave. SW, Albuquerque, NM in order for the UC to provide $1,500 to Ruby for the methamphetamine that was obtained on January 23, 2015. This is the same trailer complex RIVAS' HOUSE is located. Agents established surveillance at the trailer complex as in which the UC arrived and parked near the lobby entrance to the trailer park. Agents observed Ruby walking east towards the UC in the parking lot and meet with the UC, where the UC provided

18

Ruby with $1,500. Agents observed Ruby walk back with the illegal drug proceeds to RIVAS'

HOUSE after meeting with the UC. I believe Ruby returned to RIVAS' HOUSE in order to

store the illegal proceeds provided from the UC.

### MARCH 4, 2015

48.　Between February 28, 2015 and March 4, 2015, the UC maintained communications with

Junior in reference to money owed towards one kilogram of methamphetamine obtained by UC

on January 23, 2015, described above.

49.　On March 4, 2015, the UC and Ruby arranged to meet in order for the UC to provide

payment towards illegal drugs to Ruby. Agents observed Ruby in a gold Honda Accord depart

RIVAS' HOUSE and Ruby to be the only occupant in the vehicle. Agents did not maintain

surveillance on this vehicle at this time. Approximately ten minutes later, agents observed the

Honda Accord arrive and park next to the UC vehicle and Ruby exit the Honda Accord and meet

with the UC. Agents observed an unidentified female ("UF") in the front passenger seat of the

Honda Accord. While meeting with Ruby, the UF attempted to photograph the UC with her

camera phone. Therefore, the UC walked to the driver side door of the Honda Accord in order to

conceal his face from the UF. The UC then provided $2,000 to Ruby for the methamphetamine

previously obtained on January 23, 2015. Once the meet was over, the UC walked away and the

UF again attempted to photograph the UC. The UC immediately entered the UC vehicle and

observed the UF attempting to photograph the UC's vehicle license plate. Both the UC and the

Honda Accord then departed the area. Agents observed the Honda Accord travel down the road

on Central Avenue and park by a C U Anytime ATM, where both Ruby and the UF remaining in

the vehicle and not conducting any legitimate business. Shortly after, agents observed the Honda

Accord enter into the trailer complex where RIVAS' HOUSE is located, within which they

appeared to conduct a possible "heat run" to see if anyone was following them. Approximately

five minutes later, agents observed the gold Honda Accord exit the trailer complex and proceed

to the El Mezquite and park, during which Ruby and the UF remained in the vehicle.

Surveillance was terminated at this time due to the fear of law enforcement being detected. I

believe that during this meeting with the UC, Ruby was directed by Junior to take photos of UC

in order to find out more information about the UC.

**JUNE 10, 2015**

50.     On June 10, 2015, the UC met with Esther in Albuquerque, New Mexico, where they

discussed the UC purchasing approximately one kilogram of heroin from Esther. During this

conversation, Esther asked the undercover agent if the UC had spoken with "Memo," another

name to be utilized by Junior. The UC advised no and added that the UC did not like working

with Junior. Esther stated the Junior was sending a load a methamphetamine to Albuquerque,

New Mexico by Wednesday, and that Junior was going to send Esther two pounds of

methamphetamine. Esther then stated that Ruby was more involved with Junior's drug

trafficking activities in Albuquerque, New Mexico, and was now driving an $18,000 Dodge

Nitro. Esther offered to sell the UC ounces of methamphetamine for $650 an ounce. On

December 3, 2015, agents observed a silver Dodge Nitro parked in the driveway of RIVAS'

HOUSE bearing NMLP NKH873.[1]

51.     I have personally spoken with DEA Financial Investigator ("FI") Kevin Small, who has

assisted with financial components of this investigation. According to FI Small, on August 15,

2015, Ruby sent $950 to Samuel Rivas Resendiz (believed to be the Grandfather to Ruby),

located in Chihuahua, Mexico. On September 24, 2015, Ruby sent $980 to Luis Raul

---

[1] This vehicle is registered to Graciela G. Rivas, 9600 Central Ave SW Trlr 153, Albuquerque, NM 87121.

Armendariz Garcia in Chihuahua, Mexico.  On October 15, 2015, Ruby sent $970 to Leslye

Estefany Zapata Rivas in Chihuahua, Mexico.  Early in this investigation, as referenced above,

Junior directed the UC to deposit illegal proceeds into two different bank accounts for previously

obtained methamphetamine.  Because Ruby transfers money to different individuals, FI Small

and I believe that her method is consistent with the laundering of illegal proceeds.  We therefore

believe that Ruby will have kept banking receipts, deposit information, and documents relating

to money transfers at RIVAS' HOUSE.  Here I believe, Ruby deposits the money into different

bank account, similar to what the UC was instructed to do earlier in this investigation.

52.     Based on additional information obtained from FI Small who advised computers are

being used more in order to transfer illegal proceeds, I believe Ruby stores information obtained

from illegal drug trafficking on computers that are located in RIVAS' HOUSE.  I believe that

more advanced DTO's are often transferring illegal drug proceeds by using banks.  Agents have

observed the use of banks to transfer money in this investigation.  I also believe that bank

account information is being stored at RIVAS' HOUSE in order to assist Ruby and Gloria with

depositing illegal drug proceeds into correct bank accounts, at the direction of Junior or other co-

conspirators in the DTO.  Based on the information derived from the UC meeting with Esther on

June 10, 2015, and the surveillance conducted on December 3, 2015 of RIVAS' HOUSE, agents

corroborated Esther's statement about Ruby purchasing a new Dodge Nitro for $18,000, which is

consistent with Esther's description that Ruby has become more involved with Junior's illegal

drug trafficking in Albuquerque, New Mexico.

53.     Based on surveillance operations and recorded phone calls, I believe Graciela "Gloria"

Rivas and Ruby Rivas reside at RIVAS' HOUSE.  Based on my training and experience and that

of other senior agents that I have learned from, surveillance operations, undercover proceeds

given to Ruby and Gloria Rivas, I believe members of the DTO are utilizing RIVAS' HOUSE in order to store documents relating to the distribution of illegal drugs in order to further their illegal drug activities, drug proceeds, bank account receipts, including deposit receipts, ledgers, bank account number and bulk cash tend to be kept by dealers for accounting purposes for long periods of time.  On December 2, 2015, a Grand Jury located in Albuquerque, New Mexico issued an arrest warrant for Ruby Rivas.  During the execution of the search warrant for RIVAS' HOUSE agents will be arresting Ruby Rivas.

## CONCLUSION

54.     Based upon the information provided in this affidavit, I believe the items, which are described in Attachment B for each property to be searched (Attachment C), will constitute admissible evidence of the violations outlined in this affidavit.

I swear that this information is true and correct to the best of my knowledge and belief.

JULIE A. OLMSTED
Special Agent
Drug Enforcement Administration


Subscribed and sworn to before me
This 7th day of December, 2015.

Steven C. Yarbrough
United States Magistrate Judge

22

## ATTACHMENT B

### Items To Be Seized

1.  Books, records, receipts, notes, ledgers, designated codes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances;

2.  Papers, tickets, notes, schedules, receipts, and other items relating to the SUBJECTS and others not yet identified and their co-conspirators;

3.  In any medium, including electronic medium (such as cellular telephones), books, records, receipts, bank statements and records, financial statements, insurance records, loan applications and records, wills, real estate records, money drafts, letters of credit, money orders and cashier's checks, safe deposit box keys, records and agreements, and other documents evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining and/or secreting currency equivalents by the SUBJECTS, and other individuals and business entities acting on their behalf;

4.  United States currency, precious metals, precious stones, jewelry, and financial instruments, including stocks and bonds;

5.  Photographs and videos, in any medium, including electronic medium (such as cellular telephones), of the SUBJECTS, assets, and/or depicting unlawful controlled substances;

6.  Notes, records, diaries, journals and papers referencing any interest the SUBJECTS may have in any business entities;

7.  Records indicating occupancy, residency, and/or ownership, dominion and/or control, of the PREMISES by the SUBJECTS, and others including, but not limited to, utility, cable, and telephone bills, cancelled envelopes, and keys;

8.  Sales receipts for items evidencing the expenditure of currency and/or currency equivalents;

9.  In any medium, including electronic medium (such as cellular telephones), documents, books and papers reflecting names, address books, addresses and/or telephone numbers pertaining ~~to but not limited~~ to the SUBJECTS listed above; as well as the SUBJECTS co-conspirators and associates relating to the listed offenses; *Scy*

10. In any medium, including electronic medium (such as cellular telephones), books, records, receipts, notes, ledgers, invoices, bank records, diaries, purchase records, cash receipts and disbursements journals, inventory records and other records relating to the sales, repackaging, and redistribution of controlled substances;

11. In any medium, including electronic medium (such as cellular telephones), records, journals, promissory notes, receipts, and other documents reflecting loans and loan repayment by and between any Financial Institution and the SUBJECTS and entities listed above;  all of which are fruits, evidence and instruments of crimes against the United States Government;

12. In any medium, including electronic medium (such as cellular telephones), receipts, records, and documents depicting subscriber data and itemized telephone calls to other potential drug traffickers from the residential telephone and cellular telephones utilized or associated to the SUBJECTS, and others; including but not limited to telephone toll records for homes and/or business owned or controlled by the ~~traffickers~~ SUBJECTS and their associates or other telecommunications instruments used by them and/or their drug trafficking associates;

13. Any and all paging devices, cellular phones and other communication devices, bills or receipts relating to the leasing/renting of the paging devices and cellular telephones used or owned by the ~~traffickers~~ SUBJECTS and their associates;

14. In any medium, including electronic medium (such as cellular telephones), receipts, records, and documents indicating ownership, association, and utilization over any vehicles located at the place to be searched or elsewhere, including but not limited to titles, registration, gas receipts, repair bills and keys belong to that vehicle and/or SUBJECTS and others;

15. Computer, computer software, and peripherals used by the SUBJECTS and others located at the place to be searched;

16. Other financial records which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel by traffickers and their associates; and

17. Any and all drug customer lists, dealers lists, or any notes containing the individual names of such persons, telephone numbers and/or addresses of these customers or dealers and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

**ATTACHMENT C: Description of Properties and Photos**

9600 Central Avenue SW Trailer #153, Albuquerque, NM 87121 is a single-family dwelling constructed of wood frame and wood paneling exterior. Further, the domicile in question is a singlewide trailer-home. The home is yellow in color and is trimmed in blue. The residence has an addition or extension to the residence which has a front door that faces north. There is a window to the west of the front door that also faces north. The gravel driveway sits on the west end of the residence. A wooden fence sits on the east end of the driveway with a built in gate. Access to the front door and to the yard north of the residence can be accessed by entering the gate. The number "153" is black in color, posted on the blue trim on the wall that faces west.



